**SO ORDERED.**

**SIGNED this 18th day of August, 2016.**



_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| IN RE:                                   )<br>                                          )<br>NC & VA WARRANTY COMPANY, INC.    )<br>dba 1ST CHOICE MECHANICAL         )<br>BREAKDOWN COVERAGE,               )<br>                                          )<br>                     Debtor.      )<br>_____)<br>SARA A. CONTI, TRUSTEE,           )<br>                                          )<br>                     Plaintiff,  )<br>                                          )<br>v.                                )<br>                                          )<br>COASTAL WARRANTY, LLC,            )<br>                                          )<br>                     Defendant.  )<br>_____) | CASE NO.15-80016<br>CHAPTER 7<br><br><br><br><br><br><br><br>ADV. PRO. NO. A-15-9035 |

**MEMORANDUM OPINION**
**GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING DEFFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This adversary proceeding is before the Court on cross motions for summary judgment. Defendant Coastal Warranty, LLC

1

("Coastal Warranty" or "Defendant") filed a Motion for Summary Judgment on April 29, 2016 [Doc. # 24] ("Defendant's Motion for Summary Judgment"), Robert C. Belda's Affidavit in Support of Motion for Summary Judgment [Doc. # 25] ("Belda Affidavit"), and Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment [Doc. # 26] ("Defendant's Principal Brief"). The Plaintiff Sara A. Conti ("Trustee" or "Plaintiff"), as Trustee for NC & VA Warranty Company, Inc. dba 1st Choice Mechanical Breakdown Coverage ("NCVA"), filed a Motion for Summary Judgment on April 29, 2016 [Doc. # 27] ("Plaintiff's Motion for Summary Judgment"), and a Brief and Memorandum in Support of Plaintiff's Motion for Summary Judgment [Doc. # 28] ("Plaintiff's Principal Brief") and Exhibit thereto [Doc. # 29]. The Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment on May 19, 2016 [Doc. # 30] ("Plaintiff's Opposition Memorandum"). The Defendant filed a Response in Opposition to the Plaintiff's Motion for Summary Judgment on May 20, 2016 [Doc. # 31] ("Defendant's Opposition Memorandum"), a further Affidavit by Robert C. Belda [Doc. # 32] ("Second Belda Affidavit"), and an Affidavit by George E. Loizou [Doc. # 33] ("Loizou Affidavit"). Finally, on June 2, 2016, Defendant filed its Reply Brief [Doc. # 34] ("Defendant's Reply Brief"). For the reasons that follow, Trustee's motion for

summary judgment is granted, and the Defendant's motion for summary judgment is denied.

## PROCEDURAL BACKGROUND

On September 4, 2015, the Trustee commenced this adversary proceeding against Coastal Warranty by filing a complaint against Coastal Warranty, seeking the avoidance of two transfers of $80,000 each from the Debtor to the Defendant pursuant to 11 U.S.C. § 547(b).

The Defendant filed an Answer and Counterclaim on October 8, 2015. The Answer asserts the following defenses: (1) there is no debtor-creditor relationship between Debtor and Defendant and, therefore, the Complaint fails to state a claim upon which relief may be granted; (2) the Defendant at all times held equitable title to the Reserves and, therefore, NCVA's estate holds no beneficial interest in the money pursuant to 11 U.S.C. § 541(d); and (3) the Reserves were held by NCVA in a constructive trust such that they are only properly distributed to the Defendant and not any other creditors or claimants in this action or in NCVA's underlying bankruptcy case. The Answer further asserts Counterclaims against the estate and a Third-Party Claim against the Debtor for: (1) conversion; (2) breach of contract; and (3) breach of fiduciary duty. The prayer for relief requests: (A) that the Court order the Debtor to provide an accounting; (B) that the Court order the Debtor to turn over

all monies received by NCVA for Coastal Warranty's referred contracts; and (C) that Coastal Warranty be allowed an unsecured claim in the Debtor's bankruptcy case.  On October 8, 2015, the Trustee filed her answer to the Counterclaims.

On November 3, 2015, Coastal Warranty filed a withdrawal of its Third Party Complaint under Rule 41(a) of the Federal Rules of Civil Procedure.  It is unclear whether this withdrawal also was intended to withdraw the Counterclaims against the estate.[1] Plaintiff filed this adversary proceeding on September 4, 2015. The Complaint was amended on September 8, 2015 [Doc. # 3] (the "Complaint").  In the Complaint, the Trustee seeks to avoid the transfer of a total of $160,000 transferred by the Debtor to the Defendant six days prior to the petition date pursuant to 11 U.S.C. § 547(b).  The Defendant filed an Answer and Counterclaim on October 8, 2015 [Doc. # 6] (the "Answer").

---

[1] Coastal Warranty has not filed formal proof of claim in this case.  To the extent that the withdrawal was intended to withdraw only the third-party complaint, it is possible that the Counterclaim constitutes a claim filed against the estate.  Cf. Carroll v. Farooqi, 486 B.R. 718, 722-23 (Bankr. N.D. Tex. 2013) (adversary complaint requesting allowance of claim constituted informal proof of claim).  In her answer to the Counterclaim, the Trustee requests that the Court disallow the claim asserted by Coastal Warranty against the estate.  Now that the Trustee has objected to the allowance of the claim, and to the extent that the Counterclaim is a claim against the estate, it may not be withdrawn "except on order of the court after a hearing on notice . . . ."  Rule 3006 Fed. R. Bankr. Pro.  Neither party has requested summary judgment on Defendant's Counterclaim.  Therefore, the Court need not resolve the status of the Counterclaim for purposes of this order.  The Court will schedule a hearing to determine the status of any remaining claims in this adversary proceeding.

4

## JURISDICTION AND AUTHORITY

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The parties have consented to this Court entering final judgment as to all matters raised in the pleadings, see Joint Scheduling Memorandum ¶ 10(b) [Doc. # 10], and this Court has constitutional authority to enter final judgments herein.

## FACTUAL BACKGROUND

Prior to the petition date, NCVA was in the business of selling warranty contracts and vehicle service contracts for motor vehicles to consumers through automobile dealers Complaint, Doc. # 3, ¶ 5. NCVA contracted with Dealers Assurance Company, a corporation organized under the laws of Ohio ("Dealers Assurance"), to have Dealers Assurance act as a re-insurer of NCVA's obligations to customers in the event that NCVA was unable to fulfill those obligations (the "Assurance Agreement"). Id. at ¶ 8.

### The Service Agreement

Coastal Warranty was formed to engage in the business of selling warranty contracts to consumers ("Coverage Agreements") through the dealership Select Imports ("Select Imports").

Defendant's Principal Brief, ¶¶ 4-7.  On May 18, 2010, NCVA and Defendant entered into a contract titled "Administrative Service Agreement" (the "Service Agreement").  Complaint, Ex. 1; Answer, ¶ 7.  The Service Agreement provided that NCVA would serve as the "Administrator" for all of Coastal Warranty's Coverage Agreements, using NCVA's reinsurance through Dealers Assurance. Service Agreement, ¶ 1.  Coastal Warranty agreed to pay NCVA $125.00 for each Coverage Agreement in exchange for NCVA administering the Coverage Agreements and providing reinsurance through its relationship with Dealers Assurance.  Id., ¶ 2.

Coastal Warranty entered into the Service Agreement because NCVA had "a long-standing relationship with Dealers Assurance . . . and [Dealers] has represented that it [would] provide reinsurance for [Coastal Warranty] so long as [NCVA] is [was] custodian of reserves," and provided all administrative, technical, and other support for the warranties including monitoring "payment of claims pursuant to said warranties and evaluation of the profitability of certain warranty programs, and pays such claims as are necessary."  Service Agreement, p. 1.  See also Defendant's Principal Brief, ¶ 8 ("[p]art of the incentive for Coastal [Warranty] entering into the [Service Agreement] was the relationship between NCVA and Dealers [Assurance], from which Coastal [Warranty] hoped to benefit").  The Service Agreement makes clear Coastal Warranty was

6

contracting to "use [NCVA]'s expertise, experience and staff and to satisfy the reinsurance requirements of [Dealers]. Service Agreement, p.1. The Service Agreement specifically required NCVA to maintain sufficient reserves to satisfy the requirements of Dealers Assurance. Service Agreement, ¶ 1.i.

Coastal Warranty sold the Coverage Agreements indirectly to customers through the sales staff of Select Imports in connection with automobile sales. Second Belda Affidavit, ¶¶ 20-22]. NCVA provided the form of the Coverage Agreements to Coastal Warranty, and Coastal Warranty provided those forms to Select Imports. Id., ¶ 19. After the sale of a Coverage Agreement by Select Imports, Select Imports sent sufficient funds directly to NCVA to cover the amount of the administrative fee and the reserves required by NCVA's agreement with Dealers Assurance. Id., ¶ 22. The Service Agreement requires that all other operations pursuant to the warranty contracts were performed by and through NCVA. Service Agreement, ¶¶ 1a.-j. Coastal Warranty agreed to "satisfy any additional requirements for [Dealers Assurance] as [Dealers Assurance] may reasonably request." Id., ¶ 2h.

The Service Agreement required NCVA to establish a separate account in the name of Coastal Warranty to hold the Reserves "for [NCVA] to pay claims and reimburse funds for cancellations." Id., ¶ 1, j. The Service Agreement did not

require that the account be held in trust, and did not grant Coastal Warranty a lien in the account. Instead, the parties agreed only that the "Reserves established by [NCVA] shall be the sole and complete property of [Coastal Warranty] <u>upon expiration of warranty, with the exception of claims, any expenses incurred relating to claims, and cancellation refunds issued by [NCVA]</u> within 60 days." <u>Id.</u>, ¶ 3 (emphasis added). Termination of the Service Agreement did not alter the nature of the reserve account or the funds on deposit in it. Instead, the agreement provided that, upon termination of the Service Agreement by either party, the existing Reserves "will continue to be used in the same manner as before." <u>Id.</u>, ¶ 11.

The Service Agreement provided for reciprocal obligations by Coastal Warranty and NCVA to indemnify and hold the other "harmless for any negligence of intentional acts by" employees or agents. <u>Id.</u>, p. 3.

*The Coverage Agreements*

The Coverage Agreements provided that each agreement was between the customer and Coastal Warranty. Coverage Agreement, p. 1. Nevertheless, the Coverage Agreements also provided that they were administered by NCVA and insured by Dealer's Assurance. <u>Id.</u> The agreements specifically informed the customers that, if any claim is not paid within 60 days of filing proof of loss with NCVA, they may file a claim with

Dealers Assurance under its policy of insurance in favor of NCVA. Id. The Coverage Agreements further assured the customer that "[t]his Agreement is 100% insured by Dealer's Assurance Co. as Underwriters and insurers of N.C. & VA Warranty, Inc." Id. The Coverage Agreements made Dealers Assurance directly liable to any customer who did not receive payment for any claim, and provided contact information for submitting claims directly to Dealers Assurance. Id. The Coverage Agreements notified customers that coverage only would be in effect if NCVA received and accepted the application for insurance coverage. Id. Only NCVA paid customer claims. Plaintiff's Principal Brief, Ex. 4, Affidavit of Barbara Winstead, ¶ 8 ("Winstead Affidavit").

*The Parties' Performance Under the Service Agreement*

NCVA established an account (the "Reserve Account") under its own signature authority under the name of "NC&VA d/b/a Coastal Warranty." Winstead Affidavit, ¶ 8. Despite the additional "d/b/a" placed on the name of the Reserve Account, NCVA set up the account in its own name, using its own Taxpayer Identification Number and its own Corporate Resolution. Id. ¶ 7. NCVA had sole signature authority over the account. Id. The corporate resolution, identifies the account holder as "NC&VA Warranty, Inc. DBA Coastal Warranty LLC," but uses NCVA's taxpayer identification, and is signed only by Ronnie Thomas on behalf of NCVA. Plaintiff's Principal Brief, Ex. 3 ("Corporate

9

Resolution"). All deposits into the Reserve Account were made by NCVA from funds received from Select Imports.[2] Defendant's Principal Brief, ¶ 11; Complaint, ¶ 8.

Upon expiration of any Customer Agreement, NCVA paid Coastal Warranty the amount by which the funds deposited in the Reserve Account for the applicable warranty exceeded the obligations to the applicable claimant, Dealers Assurance, and NCVA's administrative fee. Plaintiff's Principal Brief, ¶ 15. See also, Defendant's Principal Brief, p. 10, Section IV. NCVA paid Coastal Warranty the amounts payable to Coastal Warranty under the terms of the Service Agreement on a monthly basis. These amounts were calculated by deducting any amounts paid upon claims to customers and NCVA's fee and expenses from the amounts deposited that were attributable to each expired contract. Winstead Affidavit, ¶ 8. As of the petition date, Defendant concedes that NCVA was in "full compliance with all legal obligations" under the Service Agreement. See Defendant's Opposition Memorandum, p. 13.

Prior to the transfers at issue in this adversary proceeding, NCVA made certain payments to Coastal Warranty for amounts due under the terms of the Service Agreement after the

_____

[2] Select Imports has represented it acted as escrow agent for Coastal Warranty, depositing premiums that customers paid for Coverage Agreements into its own bank account, and then sending those premiums to NCVA. [Doc. # 33, ¶¶ 28-37] ("Louizou Affidavit"). The Court need not make a determination as to the relationship between the Select Imports and Coastal Warranty with respect to the claims currently before the Court on summary judgment.

expiration of warranties. The amounts ranged from $1,253.00 to $14,135.00. Winstead Affidavit, ¶ 12. Coastal Warranty refers to these payments as "profit" payments. NCVA made its last "profit" payment in the amount of $14,601.27 on December 18, 2014. Winstead Affidavit, ¶ 12. The amount owed as "profit" was determined on a rolling basis as underlying individual warranty claims expired. See Belda Affidavit, ¶¶ 6-9.

NCVA ceased operations and filed for bankruptcy on January 7, 2015. Six days prior to filing, NCVA transferred $160,000 to Coastal Warranty in two separate payments of $80,000 from the Reserve Account. Complaint, ¶ 9; Answer, ¶ 9; Winstead Affidavit, ¶ 13. There remains $10,398.83 in the account after the $160,000 transfer. Fidelity Bank Statement 1/1/2015-1/31/2015 [Doc. # 28-13, p.2].

## STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the Court must construe the "facts and inferences drawn therefrom in the light most favorable to the nonmoving party." Seabulk Offshore, Ltd. v. American Home Assur. Co., 377 F.3d 179, 183 (4th Cir. 2001).

11

The party moving for summary judgment has the initial burden of proving the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. Celotex, 477 U.S. at 323. Once this initial burden has been met, the nonmoving party must then set forth specific facts sufficient to raise a genuine issue for trial. Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Without weighing the evidence or making findings of fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Here, the moving party must demonstrate an absence of any genuine dispute as to any material fact where a material fact is one of those necessary to establish the elements of the cause of the action. Id. at 248. In order to be entitled to summary judgment, the uncontested facts as established by the movant must entitle the movant to judgment. In re Smith, 231 B.R. 130, 134 (Bankr. M.D. Ga. 1999) (when Trustee's statement of facts, though undisputed, came up short of establishing that a preferential transfer occurred, the court could not grant summary judgment; it is the movant's burden to establish all facts necessary to prevail under substantive law).

## DISCUSSION

The Plaintiff and Defendant have filed cross motions for summary judgment. The Defendant has moved for summary judgment, arguing that the record establishes that the Trustee will be unable to prove the elements required under Section 547(b)[3] to avoid the $160,000 transfers. The Defendant specifically contends that the Trustee cannot show that: (1) the Defendant was a creditor of the Debtor's within the definition of section 547(b)(1); (2) the transfer was for or on account of an antecedent debt owed by the Debtor before such transfer was made as required by 11 U.S.C. § 547(b)(2); (3) the transfer enabled the Defendant to receive more than the Defendant would have had the case been filed under chapter 7 as required by 11 U.S.C. § 547(b)(5); and (4) the Debtor had an interest in the funds transferred as required by 11 U.S.C. § 547(b).

---

[3] Under section 547(b), the trustee may avoid any transfer of an interest of the debtor in property—
(1)   to or for the benefit of a creditor;
(2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3)   made while the debtor was insolvent;
(4)   made--
    (A)   on or within 90 days before the date of the filing of the petition; or
    (B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5)   that enables such creditor to receive more than such creditor would receive if--
    (A)   the case were a case under chapter 7 of this title;
    (B)   the transfer had not been made; and
    (C)   such creditor received payment of such debt to the extent provided by the provisions of this title.

The Plaintiff has moved for summary judgment, stating the prima facie elements of a preference action under section 547(b) have been satisfied. The Court will consider the elements of 11 U.S.C. § 547(b) seriatim under the record.

## NCVA Had A Sufficient Interest In The Reserves For Purposes Of 11 U.S.C. § 547(B)

Under 11 U.S.C. § 547(b), the Trustee only may avoid transfers of "an interest of the debtor in property" as a preference. Determining whether the Debtor had an interest in the funds is essential to a preference action.

> If the property transferred is not that of the debtor, the rationales for preference avoidance collapse. Maintaining intercreditor equality is a relevant concern only with regard to the debtor's property, for it is only out of that property that the debtor's creditors normally can expect to be paid. . . . In short, the legal concern with preferences is not that one creditor of the debtor gets paid while others do not, but that the payment to that creditor is to the corresponding prejudice of other creditors.

Loggins v. Bank of Tyler (In re Loggins), 513 B.R. 682, 697 (Bankr. E.D. Tex. 2014) (quoting Charles Jordan Tabb, The Law of Bankruptcy § 6.11 at 360 (1997)).

The interest of a debtor in property is "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." Begier v. I.R.S., 496 U.S. 53, 54-58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); Cox & Schepp, Inc. v. Palmer Electric Co. (In re Cox & Schepp), 523 B.R. 511, 517 (Bankr. W.D.N.C. 2014). Courts

broadly define "interest," and may look to the definition of property of the estate under section 541(a)(1), which includes "all legal or equitable interests of the debtor in property as of the commencement of the case," when determining whether the debtor has an interest in property. Begier, 496 U.S. at 58-59; In re Derrick, 190 B.R. 346, 355 (Bankr. W.D. Wis. 1995) (The definition of interest "is as broad as possible. . . . It includes any transfer of an interest in property, including a transfer of possession, custody, or control, as possession, custody and control are interests in property.") (citing S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978) and H.R.Rep. No. 595, 95th Cong. 1st Sess. 314 (1977)).

The debtor's "interest in property" is governed by state law in the absence of any controlling federal law. See Barnhill v. Johnson, 503 U.S. 393, ----, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); In re Cybermech, Inc., 13 F.3d at 820 (under the Bankruptcy Code, state law usually controls a determination of property rights in assets of the estate).

Coastal Warranty has argued that it has ownership of the funds based on the terms of the Service Agreement. Coastal Warranty does not argue, and the evidence does not establish, that the Service Agreement, or any other agreement between the parties, operates to create an express trust in the Reserve Account. Coastal Warranty does not contend and the evidence

does not establish that Coastal claimed or perfected any lien in the Reserve Account.  There is no claim to ownership other than through the terms of the Service Agreement and the assertion of a constructive trust, which will be discussed below.

The Service Agreement does not purport to address the ownership of funds held in the Reserve Account prior to the expiration of any particular affected Coverage Agreements; it sets up a contractual relationship.  The only provision of the Service Agreement that addresses ownership of the funds in the Reserve Account provides that the funds in the account "shall be" Coastal Warranty's "upon expiration of warranty" [and then only] "with the exception of claims, any expenses incurred relating to claims, and cancellation refunds issued by [NCVA] within 60 days."  Plaintiff's Principal Brief, Exhibit 2, Doc. # 28-6, ¶ 3.  These terms provide that only certain portions of the funds "shall be" property of Coastal Warranty, those portions do not do so unless and until expiration of the affected warranty, and only do so then after and to the extent NCVA has paid all other obligations under the Service Agreement and paid any expenses incurred while servicing the Coverage Agreements (including any deductions for amounts paid to Dealers Assurance).  Coastal Warranty presumably would have a contractual right to sue for any unpaid remaining "profit" from NCVA once these terms had been fulfilled, but that right to

16

payment does not establish ownership of all funds in the Reserve
Account at the time of the expiration of any particular warranty
or at the time of the challenged transfers when it is undisputed
that the underlying warranties had not expired.

Coastal Warranty also argues that the funds were held by
NCVA solely as its agent.  Defendant's Principal Brief, at 6,
section II.  In support of this theory, Coastal argues that the
Service Agreement required the Debtor to open an account "in the
name of" Coastal, see id., p. 2 ¶ 8 (citing Service Agreement ¶
1.j.), that the checks printed for the Reserve Account bore the
logo of Coastal Warranty, id. p. 2 ¶ 9, that the only funds
deposited in the Reserve Account came from Coastal Warranty, id.
p. 3 ¶ 11, and that the Debtor had no "individual liability to
purchasers of these extended warranty contracts issued by
Coastal."  Id. p. 3 ¶ 14.

The record does not support the contention that the Debtor
acted as Coastal Warranty's agent in holding the funds.  First,
the manner by which NCVA set up the Reserve Account and the
Service Agreement's direction as to the use of the funds in the
Reserve Account do not establish a principal/agent relationship.
Establishment of an account including Coastal Warranty as a
"d/b/a" in the name is insufficient to establish that NCVA was
acting as an agent of Coastal Warranty.

17

More fundamentally, however, the record before the Court defeats any allegation that NCVA acted as an agent for Coastal Warranty. "There are two essential ingredients in the principal-agent relationship: (1) Authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." Phelps-Dickson Builders, L.L.C. v. Amerimann Partners, 172 N.C. App. 427, 435, 617 S.E.2d 664, 669 (2005) (quoting Vaughn v. Dep't of Human Resources, 37 N.C. App. 86, 91, 245 S.E.2d 892, 895 (1978)). The Debtor exercised full authority and control over the Reserve Account and over the administration of all the agreements, including the Coverage Agreements, and Coastal has not presented any facts to show Coastal had any control over NCVA or the Reserve Account. In fact, the express terms of the Service Agreement place all direction, management, and control with NCVA and belie any control at all by Coastal Warranty. The Service Agreement requires NCVA to "[d]etermine and set pricing on all warranty programs to ensure the profitability of said programs." Service Agreement ¶ 1.g. NCVA was required to "[p]rovide management advice regarding the reserves to be established by [Coastal Warranty] to ensure that sufficient reserves are available to satisfy [Dealers Assurance's] requirements and to pay any claims that might be filed." Id. ¶ 1.i. This lack of any control of NCVA by Coastal Warranty whatsoever defeats any claim of agency.

Both the Service Agreement's express terms and affidavits submitted by both parties demonstrate NCVA's possession and use of the Reserve Account amounts to ownership of the Reserve Account and the funds within the account. NCVA established an account under its own signature authority under the name of "NC&VA d/b/a Coastal Warranty." Despite the additional "d/b/a" placed on the name of the Reserve Account, NCVA set up the account in its own name, using its own Taxpayer Identification Number and its own Corporate Resolution. Winstead Affidavit, ¶ 7. The corporate resolution, identifies the account holder as "NC&VA Warranty, Inc. DBA Coastal Warranty LLC," but again uses NCVA's taxpayer identification, and is signed only by Ronnie Thomas on behalf of NCVA. Plaintiff's Principal Brief, Exhibit 3 ("Corporate Resolution"). The mere connotation of "doing business as" is insufficient to create ownership of the account by Coastal Warranty, to establish an agency relationship, to create a partnership between the parties, or to establish a trust account. Coastal Warranty specifically has conceded that the Reserve Account was not an express trust, and the Service Agreement excludes the possibility of a partnership or joint venture, providing that it is not intended to establish a joint venture, and that NCVA is acting "solely in an administrative capacity." Service Agreement ¶ 3.

NCVA, per the Service Agreement, requested the amount of funds that Coastal Warranty needed to pay into the Reserve Account for each Coverage Agreement. Service Agreement, ¶ 2(b). According to Defendant's affiant, NCVA used the funds in the Reserve Account to pay itself, pay Dealers, pay claims on the Coverage Agreements, pay refunds, pay Coastal Warranty any premiums, and pay any expenses that NCVA incurred with other creditors relating to the Coverage Agreement claims. Belda Affidavit, ¶ 6. NCVA had complete control, authority, and ability to pay itself and its own expenses that it owed to other creditors related to the Coverage Agreements from the Reserve Account.

The terms of the agreements demonstrate that the Debtor had an equitable as well as legal interest in the Reserve Account. Not only could NCVA deduct the amounts it paid to its own creditors for expenses in determining the amount owed to Coastal Warranty as "profit," but the Service Agreement and Assurance Agreement also contemplated that NCVA would be entitled to use the Reserve Account to indemnify Dealers Assurance for any claim that Dealers Assurance paid. Coastal Warranty cannot ignore the impact of the terms of the Assurance Agreement between NCVA and Dealers Assurance. The Service Agreement expressly contemplates Coastal Warranty benefitting from the Assurance Agreement. Coastal Warranty's own Coverage Agreements further assure the

customers that their coverage agreements are "100% insured by Dealer's Assurance Co. as Underwriters and insurers of N.C. & VA Warranty, Inc." Coverage Agreement, p. 2. The Coverage Agreements assured customers that Dealers Assurance was directly liable to any customer who did not receive payment from Coastal Warranty for any claim, and provided contact information for submitting claims directly to Dealers Assurance. Id. The parties specifically acknowledged in Service Agreement that NCVA "has a long-standing relationship with Dealers Assurance," Service Agreement, p. 1, and recognized that the services provided by NCVA will incorporate the reinsurance available through that relationship. Id. The agreement further and clearly contemplates that the reserves are subject to the terms of the Assurance Agreement, stating that the Reserve Account shall be sufficient "to satisfy [Dealers Assurance's] requirements and to pay any claims that might be filed." Id., ¶ 1.i. Defendant's affiant recognizes that the Assurance Agreement provided reinsurance for Coastal Warranty's insureds, and that the reinsurance for which it contracted with NCVA was subject to the terms of that Assurance Agreement. Belda Affidavit, ¶ 10 ("NC&VA entered into a reinsurance agreement with Dealers Assurance . . . to provide reinsurance coverage . . . for the Referred Contracts from Coastal Warranty.").

The provisions of the Service Agreement demonstrate that Coastal Warranty knowingly was using NCVA's structure and relationship with Dealers in order to operate, a fact which Coastal Warranty expressly concedes. See Defendant's Principal Brief, ¶ 8. Although the Assurance Agreement only was between Dealers and NCVA, Coastal Warranty's rights and obligations under the Service Agreement were wholly dependent upon the existence of NCVA's agreement with Dealers Assurance and the resulting availability of reinsurance for which NCVA solely was liable to Dealers Assurance. Coastal Warranty agreed to be bound by the strictures of NCVA's relationship with Dealers Assurance. Service Agreement, p. 1. Coastal Warranty agreed to "satisfy any additional requirements for [Dealers] as [Dealers] may reasonably request." Service Agreement, ¶ 2h. The Trustee argues that Dealers Assurance has continued to be the party liable for paying claims on Coastal Warranty Claims, and that NCVA is indirectly liable therefore to the extent that the funds in the Reserve Account are insufficient to indemnify Dealers Assurance. The documents fully support the Trustee's position. See Plaintiff's Opposition Memorandum, at 7; Winstead Affidavit, Exhibit 1.

Despite the inclusion in the Service Agreement of obligations to comply with the requirements of Dealers Assurance and Coastal Warranty's express concession that it sought to

benefit from that relationship, Coastal Warranty inconsistently and repeatedly seeks to disavow the obligations arising out of its warranties that were imposed upon NCVA under the Assurance Agreement for the benefit of Coastal Warranty and as a result of NCVA entering the Service Agreement.    See e.g., Defendant's Principal Brief, p. 2 ¶ 14 (arguing that NCVA had no "individual liability" to claimants); id. p. 6, Section II ("NC&VA itself had no interest, nor any liability to the insured persons"); Defendant's Opposition Memorandum, p. 5, Section II.B. ("nothing in the Service Agreement . . . imposes any individual financial obligation on NC&VA to the purchasers of the [warranty contracts]"); Id. at p. 10 "[t]he existence and/or terms of the Dealers Assurance Agreement and NC&VA's business dealings with Dealers Assurance . . . simply have no factual nexus to these legal issues"); and Belda Affidavit ¶ 11 ("Coastal Warranty was not a party to the Reinsurance Agreement and has no legal or financial obligations to either NC&VA or Dealers Assurance Company with respect to the Reinsurance Agreement . . . ."). These arguments wholly ignore the terms of the Service Agreement and Customer Agreements specifically referencing the Assurance Agreement and NCVA's resulting insurance policy with Dealers Assurance, the benefits conferred upon Coastal Warranty by the Assurance Agreement, Coastal Warranty's agreement to abide by Dealers Assurance's requirements, Coastal Warranty's acceptance

23

and recognition of those terms and benefits in the Service Agreement and in the briefs filed with this Court, and NCVA's obligation to service claims and indemnify Dealers Assurance to the extent it pays claims for which it is not reimbursed from the funds in the Reserve Account.

This conclusion is made further evident by the consequences to NCVA of permitting Coastal Warranty to assert ownership in funds to which it may not ultimately even had a contractual right to be paid. Under the Assurance Agreement, NCVA was required to indemnify Dealers Assurance for any amounts Dealers Assurance paid to insured claimants, but for which there were insufficient funds in the Reserve Account, and the Service Agreement permitted the use of the reserves for this purpose. See Service Agreement at 1 ("[Dealers] has represented that it [would] provide reinsurance for [Coastal Warranty] so long as [NCVA] [was] custodian of reserves," and provided all administrative, technical, and other support for the warranties including monitoring "payment of claims pursuant to said warranties and evaluation of the profitability of certain warranty programs, and pays such claims as are necessary."); Service Agreement, ¶ 1.i. (NCVA is required to establish sufficient reserves to satisfy the requirements of Dealers Assurance); Assurance Agreement, p. 1 ("NCVA is willing to unconditionally indemnify and hold [Dealers] harmless from any

and all loss arising from the issuance of its policies of insurance . . . .").

The possibility that any portion of the transfer of $160,000 potentially might have included any "profit" from the Reserves that Coastal Warranty potentially could owed under the terms of the Service Agreement does not change ownership of the funds in the Reserve Account.   For these reasons, the Court finds that the Debtor had a sufficient interest in the funds transferred for purposes of 11 U.S.C. § 547(b).

**Coastal Warranty is not Entitled to Imposition of a Constructive Trust**

Conceding that the funds in the Reserve Account were not held by NCVA in an express trust, Coastal Warranty argues the Court should find that the Coastal Warranty Reserves were subject to a constructive trust in favor of Coastal Warranty under North Carolina law.   Defendant's Principal Brief, at 11.

"[A] constructive trust is ' . . . imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.'" Graham v. Martin, 149 N.C. App. 831, 835, 561 S.E.2d 583, 586 (N.C. App. 2002) (quoting Roper v. Edwards, 323 N.C. 461, 464, 373 S.E.2d 423,

424–25 (N.C. 1988)). Despite the "well-nigh unlimited" circumstances in which a constructive trust might arise, "there is a common, indispensable element in the many types of situations out of which a constructive trust is deemed to arise. This common element is some fraud, breach of duty or other wrongdoing by the holder of the property, or by one under whom he claims . . . ." Wilson v. Crab Orchard Development Co., 276 N.C. 198, 212, 171 S.E.2d 873, 882 (1970).[4]

In this case, there is no evidence to show that NCVA gained title to the Reserve Account through some wrongdoing. NCVA took legal title to the funds upon deposit into its bank account, and the Defendant concedes that the Debtor had not violated any legal duty to Coastal Warranty as of the petition date. See Defendant's Opposition Memorandum, p. 13. The Defendant attempts to find an exception to the "indispensable element" of wrongdoing for the imposition of a constructive trust, relying upon Ballard v. Lance, 6 N.C. App. 24, 169 S.E.2d 199 (1969), in which the North Carolina Court of Appeals, without discussion

---

[4] Defendant argues that it is entitled to a constructive trust because there is no dispute that all deposits into the Reserve Account were from funds paid by Select Imports in connection with Defendant's customers and that the account title contained its name as a "d/b/a." It is true that a claimant asserting a constructive trust must identify the res of the trust by tracing funds to the property in question. See e.g., In re Dreier, 544 B.R. 760, 767 (S.D.N.Y. 2016). But the mere fact that the Defendant can trace the source of funds does not in itself establish a constructive trust. The elements of a constructive trust under applicable state law must be met.

beyond the general description of a constructive trust, imposed a constructive trust in favor of unnamed heirs.

The opinion in <u>Ballard</u> is unhelpful to the Defendant for a number of reasons.  First, the court in <u>Ballard</u> did not consider the necessity of showing wrongdoing as an indispensable element of a constructive trust, and imposed the trust with no analysis other than a general reference to fairness and equity.  <u>Id.</u> at 30, 169 S.E.2d at 203.  Second, the holding in <u>Ballard</u> is not binding upon this Court as a statement of North Carolina law.  <u>See</u> <u>In re Dillon</u>, Bankr. Case No. 05-10428C-7D, 2005 WL 1629923, *2 (Bankr. M.D.N.C. July 8, 2005) (federal courts are not bound by decisions of intermediate state courts and must "look at how the highest court in a state would interpret state law").  Third, this Court does not have to anticipate how the North Carolina Supreme Court would rule on the necessity of wrongdoing as an element, because it did so in the following year in <u>Wilson.</u>  The opinion in <u>Ballard</u> came immediately prior to the North Carolina Supreme Court's decision in <u>Wilson</u>, which pronounced wrongful conduct as an "indispensable element" of the remedy.  Fourth, if the Court were to interpret the equities giving rise to a constructive trust as broadly as urged by the Defendant, no preference action ever would be viable in North Carolina.  The question is not whether, in the absence of bankruptcy, it would have been inequitable to permit NCVA to

retain funds and use them for its own purposes rather than paying the debt it contractually owed to Coastal Warranty. If those circumstances alone gave rise to a constructive trust, there never could be any recovery of a preferential transfer because all payments are properly due and payable to creditors, and, in that sense, it would be inequitable to permit the debtor to retain funds available for payment against one to whom he owes a debt. See Omegas Group, Inc. v. Wilson (In re Omegas Group), 16 F.3d 1443, 1451-52 (6th Cir. 1994) (recognizing that constructive trusts are fundamentally at odds with the general goals of the Bankruptcy Code, and observing that the "equities of bankruptcy are not the equities of the common law").

Even more specifically than the interpretation of common law inequity urged by Defendant, the repayment of the transfers will not constitute a "windfall" to NCVA or its other unpaid creditors. In fact, if those funds would have been necessary to pay claims owed to NCVA's creditors for expenses or to pay claims on Coastal Warranty contracts for which NCVA were directly or indirectly liable in the event Dealers has made any payments on the Coastal Warranty contract claims, it would be decidedly inequitable to permit Coastal Warranty to retain the funds to which it would not even have been contractually entitled. Regardless of its ultimate contractual entitlement to payment, it would be inequitable to permit Coastal Warranty to

receive payment in full on the obligations owed to it under the
Service Agreement when NCVA's other unsecured creditors will
receive only a pro rata distribution at best, and Coastal
Warranty has not argued any other basis for inequity other than
the inter se inequity between it and NCVA.   Therefore, Coastal
Warranty is not entitled to a constructive trust.   See In re
First Central Financial Corp., 377 F.3d 209, 217-18 (2d Cir.
2004) (recognizing that, because bankruptcy policy runs counter
to the imposition of constructive trusts, courts must "act very
cautiously" and are "generally reluctant to impose constructive
trusts without a substantial reason to do so,") (citing, inter
alia, In re Braniff Int'l Airlines, Inc., 164 B.R. 820, 827
(Bankr. E.D.N.Y. 1994); and In re Vichele Tops, Inc., 62 B.R.
788, 792 (Bankr. E.D.N.Y. 1986), (imposition of a constructive
trust would work an injustice on all creditors who are not a
party to this proceeding, and recognizing that, in non-
bankruptcy matters, the courts consider primarily the interests
of the parties before them, but bankruptcy courts'
considerations of equity are broader)).

**Coastal Warranty is a creditor of NCVA**

The Bankruptcy Code defines a "creditor" as "an entity that
has a claim against the debtor that arose at the time of or
before the order for relief concerning the debtor."   11 U.S.C. §
101(10)(A).

A "claim" is a:

>    (A)    right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
>    (B)    right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

Courts have interpreted the statutory definitions of the terms claim and creditor expansively. In re E-Z Serve Convenience Stores, Inc., 377 B.R. 491, 497 (Bankr. M.D.N.C. 2007) (citing In re Cybermech, Inc., 13 F.3d 818, 821 (4th Cir. 1994)). In Cybermech, the Fourth Circuit recognized that Congress intended to give the "broadest possible definition" to the term "claim" such that all the debtor's obligations would be dealt with in the bankruptcy, including those remote or contingent. Cybermech, 13 F.3d at 821. The court found that, upon the debtor's entry of a contract and receipt a deposit for the manufacture of equipment, the creditor held a "claim" either for breach or restitution, and specifically rejected the defendant's argument that it was not a creditor because it ultimately did not suffer any damages under the contract and did not file a claim in the case. Id.

Coastal Warranty disputes that it is a creditor of NCVA by arguing it does not have a "claim" against NCVA and that it did not file a proof of claim in the bankruptcy case.  Defendant's Principal Brief, at 6, section II.  In support of this conclusion, Coastal Warranty recites permitted contractual expenditures of the funds which it contends do not include expenditures for NCVA's creditors unrelated to the Reserve Accounts, id. p. 10, Section IV, and that NCVA would receive a flat-rate of $125 per Warranty, id. p. 6, Section II. Furthermore, Coastal Warranty asserts that the undisputed facts show Coastal Warranty has made no allegation of any wrongdoing by NCVA with respect to the Service Agreement which might give rise to a claim for breach of contract.  Id., p. 7, Section II.

Coastal Warranty's analysis misses the mark.  As discussed above, Coastal Warranty's right to payment under the contract did not rise to an ownership interest in the funds.  The status of Coastal Warranty as a creditor in this case is not negated because of the absence any actual breach of contract because the challenged payment was made, but because of the existence and terms of the Service Agreement establishing a service contract between Coastal Warranty and NCVA whereby, among other things, NCVA was obligated to pay Coastal Warranty upon the termination of existing Coverage Agreements to the extent that the funds

31

deposited for the affected agreement exceeded the permitted deductions from that amount.

Coastal Warranty's argument that no claim exists because none has been filed is similarly misguided. See In re E-Z Serve Convenience Stores, 377 B.R. at 498 (determining the "fact that a contingency has not yet been triggered does not insulate a creditor from a preference action."). A creditor, as defined by the Bankruptcy Code, is a creditor if it has a claim, not if it has filed the claim that it may have. Any reading otherwise would prevent a trustee from using Section 547 to recover funds if the creditor decided it was fully satisfied by the alleged transfer and therefore chose not to pursue a claim against the debtor in bankruptcy. See In re Hunn, 49 B.R. 430, 431 (Bankr. M.D. Fla. 1985) (The Code defines "a creditor simply as an entity that has a claim against the debtor that arose at the time of or before the Order for Relief concerning the debtor. There is no reference to schedules or proofs of claim.").

The Service Agreement establishes that at the date of petition, Coastal Warranty held an unsecured, contingent claim against NCVA for whatever portion of the Reserve Account was not used to pay NCVA's administrative fee or any claims and expenses related to the underlying warranty claims. Although this was a contingent claim, the Code specifically defines the term "claim" to include contingent rights to payment. 11 U.S.C. § 101(5)(A).

Coastal Warranty would have been able to file a claim in NCVA's bankruptcy case for the amount of any profit it was owed. Therefore, Coastal Warranty was a creditor for purposes of 11 U.S.C. § 547.  See Cybermech, 13 F.3d at 821.

**The Transfer was for or on Account of an Antecedent Debt**

There can be no dispute that the payments in this case were made to Coastal Warranty on account of perceived obligations under the Service Agreement.  As discussed above, any right to payment by Coastal Warranty under the terms of the Service Agreement constituted a "claim," regardless whether that claim remained contingent and/or unliquidated on the petition date. See 11 U.S.C. § 101(5)(A).  The liability on that contingent claim was a "debt," see  11 U.S.C. § 101(12), that arose upon the execution of the Service Agreement.  Therefore, NCVA owed Coastal Warranty an antecedent debt at the time of the transfers, and Coastal Warranty was entitled to file a proof of claim for this contingent and unliquidated obligation.

Although NCVA owed Coastal Warranty and antecedent debt (although contingent and unliquidated), the Court must determine whether the payment was made "on account of" that antecedent debt for purposes of 11 U.S.C. § 547(b)(2).  That is not difficult to determine in this case, as Coastal Warranty repeatedly contends as a defense that it was entitled to receive the transfers under the terms of its Service Agreement.  In any

33

event, the Fourth Circuit uses a common sense approach to determine whether a transfer is made on account of an antecedent debt.  Smith v. Creative Fin. Management Inc. (In re Virginia-Carolina Fin. Corp.), 954 F.2d 193, 197 (4th Cir.1992)).   As explained by the Fourth Circuit:

> A common sense approach for determining whether a loan repayment is "for or on account of [a] . . . debt owed by the debtor" is to consider whether the creditor would be able to assert a claim against the estate, absent the repayment. *See* 11 U.S.C. § 101(12) (1988) ("'debt' means liability on a claim."). Under the bankruptcy code, the term "claim" is defined in the broadest possible language . . . .

Virginia-Carolina Financial Corp., 954 F.2d at 197.

As reflected in the rationale and holding in Virginia-Carolina Financial, the purpose behind the transfer is irrelevant when establishing a section 547(b) claim; courts look to the effect of the transfer, rather than the debtor's intent. See In re Garcia, 507 B.R. 434, 440 (Bankr. E.D.N.Y. 2014) (rejecting the argument that a preference action could be sustained because the transfer was motivated by Debtor's intent to remove holder of a debt from their LLC (citing T.B. Westex Foods v. Fed. Deposit Ins. Corp. (In re T.B. Westex Foods), 950 F.2d 1187, 1195 (5th Cir.1992) ("The purpose of a transfer is not dispositive of the question whether it qualifies as an avoidable preference under section 547(b) because 'it is the effect of the transaction, rather than the debtor's or

creditor's intent, that is controlling.'")).  Here, although Coastal Warranty argues that the transfers were simply transfers of its own money, the Court has rejected that contention for the reasons set forth herein, and Coastal Warranty has not argued any other purpose for the payment than to at least partially satisfy NCVA's obligations under the Service Agreement.  The effect of the transfers in fact served to at least partially pay any debt NCVA ultimately may have owed to Coastal Warranty under the Service Agreement.  The two transfers of $80,000 served to reduce any claim Coastal Warranty would have had in NCVA's bankruptcy case as of the date of the petition had no transfer taken place.  Therefore, the transfers at issue were made on account of an antecedent debt.[5]

## Solvency

A debtor is presumed insolvent if a transfer takes place during the 90 days immediately preceding the date of the filing period.  11 U.S.C. § 547(f).  The transfer of $160,000 to Coastal Warranty took place six days prior to the Debtor filing for bankruptcy, satisfying section 547(b)(4).  Because the transfers took place within the 90 days prior to bankruptcy the

---

[5] In order for a debt to be "owed" for purposes of an antecedent debt under 11 U.S.C. § 547(b)(2), it is not necessary that the debt is even mature at the time of payment, see  In re Bennett Funding Group, Inc., 220 B.R. 739, 742 n.6 (2d Cir. BAP 1998), and the debt may even remain contingent.  See In re Jeans, 326 B.R. 722 (Bankr. W.D. Tenn. 2005) (for purposes of establishing an antecedent debt under 11 U.S.C. § 547(b)(2), the debtor's obligation to pay for a car arose immediately upon his signing the purchase contract, even though his obligation to pay was contingent upon the occurrence of future events which may not occur).

Debtor was presumptively insolvent at the time of the transfers, and the Defendant has not presented any evidence to rebut the presumption.  Therefore, the Debtor's insolvency under section 547(b)(3) is not genuinely in dispute. See In re Merry-Go-Round Enterprises, Inc., 229 B.R. 337, 341 (Bankr. D. Md. 1999) (in order to meet its burden of proof on summary judgment, preference defendant must offer evidence to rebut the presumption of insolvency).

## The Transfers Allowed Coastal Warranty to Receive More Than it would have on an Unsecured Claim

The record in this case demonstrates that creditors will receive less than full payment.  As discussed above, Coastal Warranty has merely a general unsecured, unliquidated, contingent claim against NCVA for amounts owed under the Service Agreement.  In order to show that an unsecured, non-priority creditor would receive less in a chapter 7 liquidation, the Trustee must show that the distribution to this class of creditors would be less than 100%.  In re Caremerica, Inc., 409 B.R. 737, 753-54 (Bankr. E.D.N.C. 2009).  The Trustee has asserted in her affidavit that the payout to unsecured, non-priority creditors will be less than 100%.  Plaintiff's Principal Brief, Ex. 15, Trustee's Affidavit, ¶¶ 4-7.  The Defendant has not produced any evidence in opposition on this

point.   Therefore, the Plaintiff-Trustee has met her burden with respect to 11 U.S.C. § 547(b)(5).

**CONCLUSION**

For the reasons set forth herein, the Court will enter its Order granting the Plaintiff's motion for summary judgment, denying the Defendant's motion for summary judgment, and entering judgment in favor of the Trustee and against Coastal Warranty avoiding the transfer of $160,000.00 under 11 U.S.C. § 547(b).

[END OF DOCUMENT]